(*Recorder's Court of Chicago.*)

### The People ex rel. Dennis Graufield

### vs.

### George W. Perkins, Superintendent of the Reform School.

(1868.)

1. MUNICIPAL CORPORATIONS—JURISDICTION OF CITY COURT OVER REFORM SCHOOL LOCATED OUTSIDE OF CITY LIMITS. Although the Reform School of Chicago is beyond the city limits, the recorder's court has jurisdiction as it is a city court and whatever locality the corporation holds in its character of land proprietor and governs by its common council, is within the territorial jurisdiction of that court.

2. STATUTES, CONSTRUCTION OF—PARI MATERIA. It is a familiar rule of construction that when certain things are specified in a statute and followed by general words as in this case "other writ or process," nothing will be included under the general words except what belongs to the same class as specified.

3. SAME—HABEAS CORPUS—NATURE OF WRIT. The writ of habeas corpus is an original writ and not an auxiliary one, differing in this respect from the writs of *ne exeat* and injunction. Like the writ of certiorari it is one of right and will never be deemed taken away by implication.

4. REFORM SCHOOL ACT OF 1863—JURISDICTION OF JUDGE—WHAT NECESSARY. Under the Reform School act, the judge does not act as a court but as an officer with special and limited juris-

diction, in which case there is no presumption in favor of jurisdiction but compliance with every provision of the statute is essential to jurisdiction.

5. SAME—WANT OF SERVICE—EFFECT. If the summons provided for by the Reform School act be not served upon the party indicated in the statute, the want of such service defeats the jurisdiction of the officer and renders the commitment void.

6. CONSTITUTIONAL LAW—STATE AS PARENS PATRIAE—ITS POWER. The power of the state as *parens patriae* in a proper case, extends only to the placing of others over the child with the same limited authority as a parent would ordinarily have.

7. SAME—INVOLUNTARY SERVITUDE—BILL OF RIGHTS—REFORM SCHOOL ACT. A reform school act, which purports to authorize others to seize a child and confine him in prison for many years and compel him to labor for their benefit without a regular trial or an accusation of crime against him, deprives the child of his liberty without "due process of law," and amounts to involuntary servitude not as a punishment for crime.

*Walter & James V. A. Butler,* for the relator.
*Hasbrouck Davis,* for the reform school.

McALLISTER, J.:—

The writ of *habeas corpus* was allowed in this case for the purpose of inquiring into an alleged illegal imprisonment of one Dennis Graufield, a boy a little over fourteen years of age, and who has been confined since the 20th of July, 1866, in the reform school of the city of Chicago. The writ was served on the superintendent at the reform school, and he admitted due service. He appeared, however, by the city attorney, who moved to quash the writ on two grounds, viz:

1. The reform school being beyond the city limits, the court has no jurisdiction.

2. The statute, defining the powers of the court, requires ten days' notice of the application of the writ.

He also moved that the case be transferred to the superior court of Chicago.

Neither of the grounds stated for the motion to quash is tenable.

First, then, as to jurisdiction: The recorder's court is a city court; and whatever locality the corporation holds, in

its character of land proprietor, and governs by its common council, is within the territorial jurisdiction of this court. The institution in question is called "The Reform School of the City of Chicago." The site upon which it stands was, pursuant to authority, given by the legislature, selected and purchased, and is held by the city for that purpose; and the institution, by the same authority, was committed to the full control of the city. This locality is as much a part of the city as any portion of Lake street is; and a crime committed there, if otherwise cognizable by this court, would be as clearly within its jurisdiction as if committed in the armory.

Secondly. As to the ten days' notice: If the position of the city attorney is correct, then, when a person in jail is ready to give bail in cases pending in this court, and desires a writ of *habeas corpus* for that purpose, he must give the sheriff ten days' notice, lie in jail until the time expires, and then the sheriff may, by filing a request, as is done in this case, have the application transferred to another court. The act creating this court clearly gives it power to issue the writ of *habeas corpus*, the same as the circuit court may. The subsequent act relied on declares that "Neither the said recorder's court, nor the judge thereof, shall grant any writ of *ne exeat*, injunction, or other writ or process, which said court or judge shall have power to issue in civil cases, excepting original writs of summons, capias, attachment, etc., unless the person against whom such writ is granted shall have ten days' notice," etc.

It is a familiar rule of construction that, when certain things are specified in a statute, and followed by general words, as in this case, "other writ or process," nothing will be included under the general words except what belongs to the same class as those specified. The writs that are here specified are such as are auxiliary to the original process and proceedings. The writ of *habeas* corpus is not auxiliary to any other writ; but is the original summons. The writ of *habeas corpus*, like the common-law *certiorari*, is one of right and will never be deemed taken away by implication. The motion to quash the writ, and transfer the case to the superior court must be overruled.

We must, then, meet the questions involved on the merits of the case, viz: Was the boy Dennis Graufield illegally committed to the reform school, and is he there illegally detained? The evidence in the case shows that at the time of his capture he had and still has both father and mother living in this city. His father was and is in good circumstances, worth, as he states, between $10,000 and $15,000; had a good and respectable home, at which the boy lived, and had as good parental care as a majority of children in the city. He was not accused, indicted, or convicted of any crime, but was brought before Judge Jameson of the superior court, acting as commissioner under the reform school act, and, by his order, committed to the reform school, and that commitment is the only legal cause for his caption and detention relied upon. The city attorney strenuously insists that this commitment is final and conclusive upon the whole world. If this be true, there exists among us a power of the most dangerous and alarming character. This boy's parents were well settled and known citizens of the city. They were able and willing to take care of him, yet he was seized, and, without their knowledge, taken to the reform school, as it is called, wherein the superintendent claims the right to detain him until he is twenty-one years of age. So, in the same way, by the exercise of this power and its easy abuse, the little boy, of the tenderest of parents, may be seized whenever he has reached the age of six years and a day, and be sent to the same supposed reform school, and there detained in spite of the tears and wailings of his parents until he is twenty-one. There is no appeal from the decision of the judge, and no writ of error will lie. Even the governor cannot release by pardon, because there is no offense to pardon. The only possible avenue of relief would be through the discretionary action of the board of guardians, which may be composed of men jealous of power or fond of it. Are the free-born subjects of this state, really, by the law of the land, to be placed in a position where, being themselves wholly innocent of crime, and their children likewise innocent, they are to be forced to beg on their knees, before some board, for the privilege of enjoying the

custody and society of their own children? These are grave
questions, and from the cases that have come before this
court may well be asked at every fireside. I propose now to
analyze this claim of power, and see whether it have legally
any foundation or not.

The father who, by law, is entitled to the custody and
earnings of his child during his minority, comes and claims
that custody. The respondent says no. By a legal proceed-
ing you have been divested of that right, and it has been
vested in me, and shows the commitment of a judge of the
superior court to establish his position. If the statute under
which this proceeding was had has any validity, it is one
not according to the course of the common law or any reg-
ular proceedings in the courts. It is a special proceeding.
The judge does not act as a court; but as an officer with
special and limited jurisdiction, in which case there is no
presumption in favor of jurisdiction, but compliance with
every provision of the statute essential to jurisdiction must
be shown. The eighth section of the original act requires
the commissioner to issue a summons or notice to the father
of the boy, if living and resident in the city, to appear be-
fore him at such time and place as he shall in such sum-
mons or notice appoint; and to show cause, if any there be,
why the said boy shall not be committed to the reform school.
And upon appearance before him of the party named in said
summons or order, or if, after due service had of the sum-
mons or order, there shall be no such appearance, the said
commissioner shall, upon expiration of the time named in
said summons or order for said appearance, proceed to ex-
amine said boy, etc. Municipal laws, pp. 132, 133. By the
fourth section of the act of 1867, in reference to the reform
school, the powers and duties of the commissioner are con-
ferred upon the judges of the superior and circuit courts.

Before the judge has jurisdiction to proceed and examine
the boy, the summons or notice mentioned must be served
upon the father, if a resident of the city, and, in the ab-
sence thereof, the judge has no more power or authority to
commit than the mayor would have.

The records of the superior court in this case were produced, and no summons or notice appears; none is recited, nor is it claimed that any of the papers are lost. There is upon this point something rather singular. It is not probable that a judge of the high character of Judge Jameson would proceed to commit without he supposed he had complied with the statute in this particular. And, it is quite probable from all that does appear, that he was imposed upon by somebody. The parents swear most explicitly that they, neither of them, had any notice. The respondent says in his return: "I further return that said judge of the superior court of Chicago did issue the summons required by the provisions of said acts, and caused the same to be served prior to the examination of said boy."

Served upon whom? If it is known upon whom served, why not say upon whom? It certainly was not the father of the boy. This return and the absence of the pretended summons, together with the fact that the father was not served, gives rise to the suspicion that somebody falsely personated the father, and thus imposed upon the judge. At all events, the want of service defeats the jurisdiction of the officer and renders the commitment void. *Burdick v. Blook,* 1 Hill (N. Y.) 130, and cases there cited.

But could this commitment be upheld, even if every provision of the statute had been complied with? The nature and character of this so-called reform school have been fully investigated in this court upon the testimony of the assistant superintendent himself, and other evidence. It is called by the pleasant name of school; but is in reality a prison. It is just as essentially a prison as the state prison at Joliet. The inmates are subject to a coercive system of labor, for the benefit of the institution or superintendent; and it is as rigidly enforced as at the state penitentiary. As a prison for juvenile offenders, who have been indicted and convicted, it is far preferable to the jail or bridewell. But I deny the authority of any man, or set of men to seize boys who are innocent of crime, and hold them in prison subject to involuntary servitude. The worst burglar in the state can be

32

·sent to the state penitentiary for only fourteen years; and yet by this system, a child who has attained the age of six years and one day may be seized and imprisoned like the burglar, subject to the same system of hard labor for fifteen years, although as innocent as when his eyes first saw the light of heaven.

If such a power exist whence is it derived? The learned ·counsel for the respondent says: From the state as *parens patriæ.*

Before and at the time of American independence, the sovereigns of England claimed and exercised many prerogatives as parent of the country. Through his court of chancery he appointed guardians for infants and committees for the custody of idiots and lunatics. "The king as *parens patriæ* has the general superintendence of all charities; which he exercises by the keeper of his conscience, the chancellor." 3 Bl. Com. 428. In *Wheeler v. Smith,* 9 How. (U. S.) 55, 78, the supreme court of the United States, McLean, Justice says: "When this country achieved its independence, the prerogatives of the crown devolved upon the people of the states. And this power still remains with them, except so far as they have delegated a portion of it to the federal government. The sovereign will is made known to us by legislative enactment, and to this we must look in our judicial action instead of the prerogatives of the crown. The state as a sovereign is the *parens patriæ.*"

The sovereign will is made known to us by legislative enactments. But it is also expressed by the constitution, which contains many limitations by which the legislative power is ·controlled. Never since the days of the Magna Charta was it lawful for the sovereign of England, as *parens patriæ,* to keep infants innocent of crime, imprisoned during their minority. And in this state the power extends only to the placing of others, under circumstances, in the place of parent with the same limited authority. A parent may use moderate chastisement; have custody and control of his children; but he cannot keep them in continuous imprisonment. "When necessary to the discharge of parental duty he may resort to corporal discipline. He may impose such tempo-

rary confinement as may be necessary to secure obedience to his reasonable commands, so that it is not prejudicial to the life, limb, or health of the child." Hurd on Habeas Corpus, 43. Again, on page 45, the same author says: "Temporary confinement is allowed as a means of enforcing obedience to reasonable commands. But this power must also be exercised with moderation." Such temporary confinement would not probably be deemed imprisonment within the inhibition of the constitution. Section 8 of article 13 of the constitution of this state declares: "That no freeman shall be imprisoned or disseized of his freehold liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property but by the judgment of his peers, or the law of the land."

"It may be received," says Kent, "as a proposition universally understood and acknowledged throughout this country, that no person can be taken or imprisoned; or disseized of his freehold or estate; or exiled or condemned; or deprived of life, liberty or property, unless by the law of the land, or the judgment of his peers. The words 'law of the land,' as used originally in Magna Charta, in reference to this subject, are understood to mean due process of law, that is, by indictment or presentment of good and lawful men; and this, says Lord Coke, is the true sense and exposition of those words. The better and larger definition of due process of law is, that it means law in its regular course of administration, through courts of justice." 2 Kent's Com. 13; Story's Com. on Constitution, vol. 3, 661; *Taylor v. Porter,* 4 Hill (N. Y.) 140, 146. "The law of the land, in the bill of rights," says Chief Justice Ruffin in an elaborate opinion delivered in *Hoke v. Henderson,* 4 Dev. (N. C.) 15, "does not mean merely an act of the legislature, for that construction would abrogate all restriction upon legislative authority. The clause means that statutes which would deprive a citizen of the rights of persons or property without a regular trial according to the course and usage of the common law, would not be the law of the land in the sense of the constitution."

That the statute in question, which purports to authorize

others to seize a boy and confine him in prison for so many years, and compel him to labor for their benefit, without even an accusation of crime against him, is just such a statute as the principles of the bill of rights make void, there can be no doubt. "There shall be neither slavery nor involuntary servitude in this state except as a punishment for crime, whereof the party shall have been duly convicted," says the constitution, yet there is a system of involuntary servitude rigidly enforced in this institution upon those who have committed no crime, or been subject to any accusation, enforced, too, by all the powers incident to close imprisonment. Nothing but the audacity of corporate power could complacently insist upon carrying out such a statute against innocent boys. "It requires," says the great luminary of American law, "more than ordinary hardiness and audacity of character to trample down principles which our ancestors cultivated with reverence; which we imbibed in our early education; which recommend themselves to the judgment of the world by their truth and simplicity; and which are constantly placed before the eyes of the people, accompanied with the imposing force and solemnity of a constitutional sanction. Bills of right are part of the muniments of freemen showing their title to protection, and they become of increased value when placed under the protection of an independent judiciary, instituted as the appropriate guardian of private rights." 2 Kent's Com. 8.

It is considered by the court that Dennis Graufield is unlawfully imprisoned in the reform school of the city of Chicago, and accordingly ordered that he be forthwith discharged therefrom.

### NOTE.

In *People ex rel. O'Connell v. Turner, Superintendent,* 55 Ill. 280, the supreme court held the same law unconstitutional on reasoning similar to that of Judge McAllister in the principal case.

*In re Petition of Ferrier,* 103 Ill. 367, it was held that the act of 1879, establishing industrial schools for girls who lacked proper parental care, were dependent upon the community for support or were

surrounded by vicious influences, was constitutional. The court puts its decision on the ground that the institution created by the statute is in fact a school and not a prison and that the state under the act is only assuming its character of *parens patriae* in cases where the parents of the girl are incapable guardians of the child's welfare.

The industrial school act of 1879, was again held to be constitutional and no infringement of the right of personal liberty in *County of McClain v. Humphreys*, 104 Ill. 378.

In *People ex rel. Schwartz v. McLain*, the supreme court of Illinois had before it the question of the constitutionality of the Juvenile Court Act of 1899, and an opinion was rendered therein on December 20, 1905. A petition for a rehearing was subsequently filed but while under consideration, the case itself was dismissed and the opinion of December 20, 1905, withdrawn. The opinion although not binding as a precedent is nevertheless of considerable interest, and for that reason it is here reprinted in connection with the above decision. The court in its opinon holds:

1. That a commitment of a boy to a state institution on the sole ground that he has been guilty of a misdemeanor in proceedings to which the parents are not parties, deprives the parents of the right to pursue happiness and of their rights in the boy's services, without due process of law.

2. Mere violation of law cannot constitute delinquency where there is no such unfitness on the part of the parents to care for the boy as gives the state the right to substitute its care for that of the parents.

3. That the provision for a trial by a jury of six is not unconstitutional since the proceeding is not criminal in its nature, the commitment being to an actual school wherein the state truly assumes the character of *parens patriae* and not to a prison wherein the boy is really held and punished as for crime.—Ed.

PEOPLE EX REL. SCHWARTZ V. MCLAIN.

Original petition for habeas corpus by the people, on the relation of Joseph Schwartz, against Nelson W. McLain. Writ granted.

*Louis Brandes*, for relator. *Peck, Miller & Starr* and *Pence & Carpenter (Merritt Starr* and *George A. Carpenter*, of counsel), for respondent.

BOGGS, J. This is a petition for a writ of habeas corpus, filed originally in this court. The petition avers that Samuel Schwartz, a son of the petitioner, of the age of 14 years, is unlawfully restrained of his liberty by the respondent, Nelson W. McLain, in his official capacity of superintendent of the St. Charles Home for Boys.

It appears from the pleadings on which the cause has been submitted for decision that the relator, Joseph Schwartz, is a resident, and on the 20th day of June, 1905, was a resident of the city of Chicago; that he was the head of a family consisting of himself, his wife, Rachel, and their son, Samuel; that he (the relator) provided his wife and said Samuel, his son, with a comfortable, quiet and orderly home, and maintained and supplied them with food and clothing, and supplied said Samuel with books and stationery, etc., and caused him to attend the public schools, and that relator in all respects performed and discharged his duties as parent toward said Samuel, and that he (the relator) is a reputable and law-abiding citizen, and that the parents of said Samuel have not been guilty of any act inconsistent with the correct and moral control and custody of their son; that on that day a complaint or petition was filed in the circuit court of Cook county, on the chancery side thereof, charging said Samuel with two violations of the provisions of section 55 of the Criminal Code of the state, in that he made "repeated indecent assaults upon Jennie Coliff and other repeated and indecent assaults upon one Fanny Cohen, all within the past two months and in the city of Chicago, county of Cook, and state of Illinois; that the said Jennie Coliff and said Fanny Cohen were then and there at the time of said assaults, and each of them was, a female child under the age of 14 years; that the said Jennie Coliff then and there resided at 72 Wilson street, in said city of Chicago, county of Cook, and state of Illinois; that said Fanny Cohen then and there resided at 88 Wilson street, in said city of Chicago, Cook county, Ill.; that said assaults were, and each of them was, publicly committed in the rear of 92 Wilson street, in said city of Chicago, Cook county, Ill., and said assaults were, and each of them was, an act of disorderly conduct and a notorious act of public indecency tending to debauch the public morals;" that subsequently, in pursuance of proceedings in the said circuit court under said petition, a decree was entered finding said Samuel guilty of the acts of disorderly conduct and of public indecency tending to debauch the public morals, charged against him and in violation of said section 55 of the Criminal Code, and declaring said Samuel to be a ward of said court, and ordering that he be committed to the St. Charles Home for Boys, there to remain until he should arrive at the age of 21 years, unless sooner discharged according to law; and that the respondent restrains said Samuel in said home for boys in virtue of this order of the court.

It appears from the transcript of the proceedings that the order that the boy Samuel should be taken from the custody of the relator, his father, was not on the ground that the relator had in any way failed to provide or care for the said Samuel, or had neglected to

exercise proper restraint over him, or that his habits or conduct were injurious to the moral or physical interests of the boy, but solely on the ground the boy had, by disoderly conduct and the acts of public indecency before mentioned, violated section 55 of the Criminal Code. The relator and his wife, Rachel, the mother of the boy, were cited to bring Samuel, the son, before the court to answer the charges of disorderly conduct and acts of public indecency, but were not made parties to the proceeding, nor were there before said court any charges of the omission of parental duty and care preferred against them, nor did the order entered by the court proceed on the theory the relator or his wife, Rachel, had, by any parental delinquencies, lost the right to keep their son in their family and rear their boy and enjoy his society and receive the benefits of his labor and services. The decree that the boy shall be the ward of the court and should be taken from his home and the custody and care of his parents was based solely on the ground that the boy had committed the misdemeanors aforesaid in violation of the provisions of said section 55 of the Criminal Code, the violation whereof said section 55 provides shall be punished by the infliction of a fine in any sum not exceeding $200 for each offense.

The proceeding in the circuit court, which resulted in the decree committing the said Samuel Schwartz to the St. Charles Home for Boys, was in pursuance of one of the provisions of the act of the General Assembly entitled "An act to regulate the treatment and. control of dependent, neglected and delinquent children," in force July 1, 1899. 4 Starr & C. Ann. St. Supp. 1902 p. 375. In order to accomplish the purposes indicated in the title, the act provides that a petition in writing, verified by affidavit, may be filed in the circuit or county court, setting forth facts showing that a child in the county is either neglected and dependent or delinquent, and praying for proceedings to be had and taken under said petition for the disposition of such child as shall be found to be neglected and dependent or delinquent. Section 1 of the act defines a delinquent child as follows: "The words 'delinquent child' shall include any child under the age of sixteen (16) years who violates any law of this state or any city or village ordinance; or who is incorrigible; or who knowingly associates with thieves, vicious or immoral persons; or who is growing up in idleness or crime; or who knowingly frequents a house of ill-fame; or who knowingly patronizes any policy shop or place where any gaming device is or shall be operated." Section 9 of the act purports to authorize the court to commit any child so found to be delinquent, if a boy, to a training school for boys, or to "any institution within the county, incorporated under the laws in this state that may care for delinquent children, * * *

or to any state institution which may be established for the care of delinquent boys." It was in virtue of this provision of the said act that the said Samuel Schwartz was ordered by the circuit court of Cook county, to be taken from the custody of the relator, his father, and committed to the care of the respondent, as the superintendent of the St. Charles Home for Boys, on the ground that the boy had violated, in the manner hereinbefore related, the provisions of said section 55 of the Criminal Code, and had thereby become deemed to be a delinquent boy, within the meaning of said statute.

If this enactment is effective and capable of being enforced as against the relator, father of the boy, it must be upon the theory that it is within the power of the state to seize any child under the age of 16 years who has committed a misdemeanor punishable under the Criminal Code of the state by fine, or who has violated an ordinance of any city or village of the state, and take him from his home and from the custody of his father and the care of his mother and commit him to a state institution which may be established for the care of delinquent boys, and there keep and train and raise him, though the father may have always provided a comfortable, quiet, orderly, and moral home for him, and have supplied him with school facilities, had not neglected his moral training, and had been and was still ready to render to him all of the duties of a parent. We do not think it is within the power of the General Assembly to thus infringe upon parental rights. At the common law and at the time of the adoption of the Constitution of 1870, the father possessed the legal right to the care, custody, and control of his minor children, and was entitled to the services and earnings of such children. These parental rights cast upon the father, as a corresponding obligation, the duty to maintain, support, and educate the children, and to treat them with kindness and affection. Section 1 of the Bill of Rights (Const. 1870, art. 2, § 1) guaranties protection to the inherent and inalienable rights of men, among these rights being "the pursuit of happiness;" and section 2 of the same article of the Constitution protects the parent against the destruction of his property rights in the services of his child without due process of law.

The right of the parent to the care and custody of the child has its foundation in the love and affection which nature has implanted in the heart of the father for his offspring. It is one of the strongest and deepest emotions of the human mind and heart, exists as a prompting of nature for the protection and safety of the child, and conduces largely to the happiness of the parent. It is difficult to define "pursuit of happiness" but it is clear it comprises the right to enjoy the "domestic relations and the privilege of the family and the home." Black on Constitutional Law, § 204. To guaranty to a

parent the right to the pursuit of happiness forbids that he should be deprived of the right to the custody, the association, and the society of his child, or of his right to teach and train the mind of the child and fit it for the walks of life, unless considerations affecting the public welfare require such rights shall be abridged or surrendered for the general good of the state. The parent may, by reason of his failure to appreciate and perform that which is requisite to the moral, intellectual, and physical welfare and development of the child, forfeit his right to the custody and care of his child. The public welfare is concerned in the culture, education, and moral training of children, and the state may supplant the parent as custodian and protector of the child, if the delinquencies or unfitness of the parent require that the child shall be deemed the ward of the court, acting for the public. The child may be found to be so possessed of and controlled by wicked degeneracy, or so incorrigibly evil, and the parent so indifferent to the moral and intellectual growth of the child, or so otherwise unfit to be intrusted with the power to train and cultivate the mind and conscience of the child, that it may become lawful to commit the child to the public care and custody. In such an event the right of the parent may be deemed secondary to that of the general public as organized for the safety and welfare of mankind. But no such public considerations are here shown to exist. The boy, Samuel, has been shown to be guilty of offenses which in an older and more matured person would be but a misdemeanor, punishable only by a fine of not exceeding $200 for each offense. He is not a dependent, neglected child. His father has not, by any act or omission on his part, forfeited his right to care for and enjoy the society of and train his son for the duties and responsibilities of manhood. That extraordinary exigency which may justify the state in supplanting the father as the natural custodian and protector of his son does not here exist.

The property right of the father in and to the services and labor of his son during his minority would also, under the circumstances of this case and under the proceedings here under consideration, to which the father was not a party, be unlawfully infringed by the assumption on the part of the state of the control and custody of the son on the mere ground that the son had committed the misdemeanor in question. The statute here relied upon to justify the detention of said Samuel as a delinquent child, under the circumstances of the case, infringed the constitutional rights of the father, and cannot be enforced. What is here said has no reference to the statute regulating the disposition to be made of "dependent or neglected" children. Moreover, it is to be understood we do not hold the statute regulating the disposition to be made of delinquent children to be

unconstitutional *in toto* and as to every parent or as to all children, but that under the circumstances of this particular case constitutional rights of the father have been infringed, and therefore the detention of Samuel Schwartz in the St. Charles Home for Boys cannot be justified or upheld.

There is no force in the contention so strenuously advanced by counsel for the relator that the proceedings under this statute are criminal proceedings, and that a boy who is the subject of judicial investigation under this statute is entitled to a trial by a jury of 12 men. The proceeding is statutory, and its object is, not the enforcement of the criminal law, but the protection of children. Infants are, in general, in a sense wards of courts of chancery, and the practice and procedure in causes under this statute, affecting, as they do, the care and custody of minors, and being for the proteciton of infants, should be that of courts of equity, so far as consistent with the provisions of the statute. The commitment to the home for boys, in cases in which the statute is applicable and is, properly enforced, is not imprisonment as punishment for the violation of the criminal laws of the state or the ordinances of cities and villages, but is merely the assumption of the state, in its capacity of *parens patria*, of parental authority for the education and reformation of the child, and the home for boys is not to be regarded as a prison, but is, in fact, a home and a school established by law for the benefit and good of those who are found, under the provisions of the statute, to stand in need of parental care and means of reformation and intellectual and moral training. Such is the general view of statutes and institutions of this character. *Petition of Ferrier,* 103 Ill. 367, 43 Am. Rep. 10; *Milwaukee Industrial School v. Milwaukee County,* 40 Wis. 328, 22 Am. Rep. 702; *House of Refuge v. Ryan,* 37 Ohio St. 197; *Prescott v. State,* 19 Ohio St. 184, 2 Am. Rep. 388; *Scott v. Flowers,* 60 Neb. 675, 84 N. W. 81; *In re Mason,* 3 Wash. St. 609, 28 Pac. 1025. The provisions of section 2 of the act prescribing the procedure as to trial by jury is constitutional and valid. *Petition of Ferrier, supra.*

The judgment of this court will be that the detention of said Samuel by the respondent, in his official capacity as superintendent of the St. Charles Home for Boys, is without sufficient warrant of law; that the relator is entitled to the custody of said Samuel, his son. Judgment will therefore be entered awarding the custody of said Samuel Schwartz to the said relator according to the prayer of his petition.

Writ granted.